# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Leslie J.,

        Plaintiff,

v.

Nancy A. Berryhill,
Deputy Commissioner for Operations,
performing the duties and functions not
reserved to the Commissioner of Social
Security,

        Defendant.

Case No. 17-cv-1319 (TNL)

**ORDER**

Gerald S. Weinrich, Weinrich Law Office, 400 South Broadway, Suite 203, Rochester, MN 55904 (for Plaintiff); and

Pamela Marentette, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

Plaintiff Leslie J. brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 12, 15.) Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary

judgment (ECF No. 12) is **DENIED** and the Commissioner's motion for summary judgment (ECF No. 15) is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in February 2014, asserting that she has been disabled since December 2012, due to, among other things, fibromyalgia, a spine disorder, dysfunction of the joints, and lymphedema. (Tr. 43, 161-62, 173, 174-75, 186.) Plaintiff's DIB application was denied initially and again upon reconsideration. (Tr. 43, 172, 173, 184, 186.) Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 43, 208-09.)

The ALJ held a hearing in November 2016. (Tr. 43, 99, 232, 254.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council. (Tr. 27-29, 40-58.) The Appeals Council granted Plaintiff's request for review, adopting the ALJ's findings and conclusions as to whether Plaintiff was disabled but correcting the date last insured from December 31, 2015, to September 30, 2016. (Tr. 1-7.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 12, 15.) This matter is now fully briefed and ready for a determination on the papers.

## III. BACKGROUND

Plaintiff has a history of fibromyalgia, lymphedema, degenerative disk disease, and osteoarthritis in both knees. (Tr. 465, 437-52, 519-31, 535-36, 564, 566, 651; *see also* Tr. 622, 628-31.) In March 2012, Plaintiff underwent a left total knee arthroplasty.

2

(*See* Tr. 455-66, 496-98; *see also* Tr. 639-51.) Following the surgery, Plaintiff's left-knee pain improved. (Tr. 449.) Plaintiff's lymphedema has been primarily treated with wraps and compression stockings. (Tr. 442-43, 449, 451, 519-26, 528, 530-31; *see* Tr. 591-625.) For a period of time, Plaintiff was attending college courses to obtain an accounting degree. (Tr. 519, 540, 542.)

## A. 2013

In the beginning of March 2013, Plaintiff was seen by Carole V. Nistler, M.D., for increased symptoms associated with cervical disk disease, reporting "more severe pain which starts in the back of her neck on the right side and radiates across her right shoulder down the length of her right arm associated with a feeling of numbness in her right arm and hand." (Tr. 428.) Plaintiff reported that "her 2nd, 3rd and 4th digits feel numb on a consistent basis." (Tr. 428.) Plaintiff was currently using ibuprofen and occasionally oxycodone, but did not feel that these "completely resolve[d] her symptoms." (Tr. 428.) Plaintiff rated the pain in the right side of her neck and right shoulder at 9 out of 10. (Tr. 430.) Plaintiff also requested that Dr. Nistler renew a medical opinion form that Plaintiff was "still not able to return to work based on her multiple health conditions including her cervical disk disease, fibromyalgia and bilateral lower leg lymphedema." (Tr. 428.)

Upon examination, Plaintiff "demonstrate[d] normal abduction to about 90 degrees, but ha[d] some increased discomfort with movement beyond this point." (Tr.

430.)  Plaintiff's muscle bulk, tone, and strength were normal in both of her upper extremities.  (Tr. 430.)  Plaintiff's body mass index ("BMI") was 39.9.[1]  (Tr. 429.)

In relevant part, Dr. Nistler diagnosed Plaintiff with "[c]ervical disk disease with right cervical radicular symptoms" and fibromyalgia.  (Tr. 430.)  Dr. Nistler increased Plaintiff's ibuprofen and prescribed a trial of nortriptyline.[2]  (Tr. 430.)  Dr. Nistler also ordered "C-spine and cervical" MRIs.  (Tr. 430.)  Lastly, Dr. Nistler renewed the "medical opinion form indicating that [Plaintiff] is still not able to return to work based on multiple etiologies."  (Tr. 430.)

In early April, Plaintiff was seen in the lymphedema clinic of the Mayo Clinic by Kenley D. Schmidt, M.D.  (Tr. 516-18.)  Dr. Schmidt noted that Plaintiff was currently wearing "three separate compression garments on each leg during the day."  (Tr. 517.)  Dr. Schmidt additionally noted that Plaintiff had "another semester left to finish her program in accounting" and "recently did well in a competition," resulting in a trip to Orlando, Florida.  (Tr. 517; *see* Tr. 518.)

Upon examination, Dr. Schmidt observed that Plaintiff "continue[d] to have a slightly larger left upper extremity" and "[t]he measurements of both upper extremities ha[d] increased from September 2012 but generally by about the same amount."  (Tr. 517.)  Plaintiff's lower extremities had improved from the last evaluation in February 2013 "by generally 1 to 2 cm below the knees bilaterally."  (Tr. 517.)  Plaintiff's skin was

---

[1] "Body mass index (BMI) is a measure of body fat based on height and weight that applies to adult men and women."  *Calculate Your Body Mass Index*, Nat'l Heart, Lung & Blood Inst., U.S. Dep't of Health & Human Servs., https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited September 14, 2018).  A BMI of 30 or greater is considered obese.  *Id*
[2] "Nortriptyline is used to treat depression."  *Nortriptyline*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682620 html (last visited September 14, 2018).

"overall in excellent condition." (Tr. 517.) Dr. Schmidt was "impressed with the appearance of [Plaintiff's] legs," noting that Plaintiff's "measurements . . . actually decreased over the last couple of months despite the fact that [Plaintiff] has continued to gain weight." (Tr. 518.) Dr. Schmidt did not make any changes to Plaintiff's treatment regimen and directed her to follow-up in six months. (Tr. 518.)

Plaintiff followed up with Dr. Nistler approximately one week later. (Tr. 425.) Dr. Nistler noted that Plaintiff's recent cervical MRI when compared to a previous cervical MRI in 2011 showed "relatively no change." (Tr. 425; *see* Tr. 390, 492-93.) Dr. Nistler additionally noted that Plaintiff "still has evidence of multiple levels of disk degeneration, particularly at C3-4 and C4-5 with impingement of the nerve roots on the right side which is consistent with her pain syndrome and symptoms of numbness and tingling." (Tr. 425; *see* Tr. 390.) Plaintiff reported that, while the nortriptyline did not help with her pain, it did help her sleep and she was "willing to continue taking it." (Tr. 425.) Plaintiff requested that Dr. Nistler renew her "handicapped parking sticker due to her cervical disk disease, fibromyalgia, lymphedema and chronic low back pain, all of which limit[] her mobility." (Tr. 425.)

Plaintiff rated her pain slightly less at 8 out of 10. (Tr. 427.) Dr. Nistler observed that Plaintiff was "able to stand and walk without assistance." (Tr. 427.) Plaintiff's BMI at this visit was 40.7. (Tr. 426.) Dr. Nistler put in a request for physical therapy and noted that the form for a handicap-parking sticker would be completed for Plaintiff. (Tr. 427.)

Towards the end of April, Plaintiff began physical therapy as ordered by Dr. Nistler to address her neck and right-shoulder pain. (Tr. 583.) Plaintiff reported neck pain and numbness in her arms and hands, with the right being greater than the left, which limited her activities and ability to work. (Tr. 583; *see* Tr. 584.) Plaintiff had difficulty with lifting, cleaning, cooking, and "prolonged computer work for school." (Tr. 584.) Plaintiff was also limited in her abilities to bowl, swim, and play cards. (Tr. 584.) Plaintiff's pain was "[c]onstant," "sharp, [and] throbby." (Tr. 584.) Plaintiff rated her pain at 7 out of 10. (Tr. 584.) Plaintiff's pain was also "worse when sleeping." (Tr. 584.)

Plaintiff's range of motion was approximately 50% of normal motion in both flexion and extension, with pain on extension. (Tr. 585.) Plaintiff was able to rotate left and right 55 degrees and side-bend both left and right 15 degrees, all with pain. (Tr. 585.) Plaintiff's shoulder flexion was approximately "75% of normal" and right flexion caused pain. (Tr. 585.) Plaintiff's shoulder muscles were within normal limits. (Tr. 585.) The physical therapist assessed Plaintiff with "[n]eck pain and impaired neck [range of motion] with bilateral radiculopathy symptoms impaired by fibromyalgia, gout, and degenerative dis[k] disease." (Tr. 583.) While Plaintiff had a headache after the first session, there was "no numbness/tingling in [her] hands post treatment." (Tr. 586.)

Plaintiff had two additional physical therapy visits over the course of the following week. (Tr. 581-82.) Each time, Plaintiff rated her pain between 7 and 8 out of 10. (Tr. 581-82.) Plaintiff's neck was stiff and her shoulders were sore during one visit. (Tr.

581.)  She did not have any numbness or tingling in her hands or arms during either visit.  (Tr. 581-82.)  Plaintiff reported decreased stiffness and pain with treatment.  (Tr. 581-82.)

Plaintiff had one additional physical therapy visit in each of the months of May and June before declining to continue.  (Tr. 578-80.)  During the May visit, Plaintiff "report[ed] decreased pain," rating her pain at 2 out of 10 with no arm pain.  (Tr. 580.)  In June, however, Plaintiff had "increased pain that she [wa]s unable to manage at home on [her] own."  (Tr. 579.)  Plaintiff reported that "stretches are difficult and seem to make pain worse."  (Tr. 579.)  Plaintiff rated her pain between 7 and 9 out of 10, with arm "heaviness and pain" but no numbness.  (Tr. 579.)  The physical therapist discussed using a relaxation CD, "downtraining [sic] of muscles and nerves," and Tai Chi or yoga exercises for stability.  (Tr. 579.)

Plaintiff next saw Dr. Nistler in July "for follow[-]up of her chronic pain syndromes related to her cervical dis[k] disease, fibromyalgia, bilateral knee osteoarthritis and chronic lower leg lymphedema."  (Tr. 419.)  Dr. Nistler noted that these conditions have "precluded [Plaintiff] from being able to pursue gainful employment and although she is able to attend classes, she is able to do this because she can tolerate sitting for 30-60 minutes at a time but typically thereafter has to shift position because of her chronic pain symptoms."  (Tr. 419.)  Dr. Nistler noted that Plaintiff "anticipates some improvement in her symptoms . . . when she pursues right knee replacement, which is being scheduled for later this year."  (Tr. 419.)  Plaintiff requested documentation for "student loans that she is not yet able to pay back . . . because of her physical limitations."  (Tr. 419.)  Plaintiff again rated her pain at 8 out of 10.  (Tr. 421.)  Her BMI

was 42.4.  (Tr. 421.)  Dr. Nistler renewed the "statement for [Plaintiff's] student loans indicating that she remains unable to work in any capacity due to her multiple chronic health conditions and pain syndromes."  (Tr. 421.)

Plaintiff met with Matthew J. Kirsch, M.D., in orthopedics and sports medicine in early August to address her right-knee pain.  (Tr. 417.)  Plaintiff rated her pain at 8 out of 10, which was "worse with weight-bearing and better with rest."  (Tr. 417.)  Plaintiff stated her knee "fe[lt] weak with clicking and grinding," and denied any numbness or tingling.  (Tr. 417.)  Dr. Kirsch note that Plaintiff "had a similar problem in the left knee that has improved significantly since the 2012 left total knee arthroplasty."  (Tr. 417.)

Dr. Kirsch observed that Plaintiff had an "[a]ntalgic right-sided gait pattern"; exhibited "edema bilaterally symmetric in her lower extremities consistent with lymphedema"; and was tender to palpation across the medial joint line of her right knee. (Tr. 417.)  Plaintiff was able to "achieve full extension."  (Tr. 417.)  Dr. Kirsch reviewed x-rays of Plaintiff's knees, noting that "[s]he has complete medial joint space loss in the right knee" and subchondral sclerosis.  (Tr. 417; *see* Tr. 388.)

Among other things, Dr. Kirsch assessed Plaintiff as having "[r]ight knee severe varus degenerative arthritis," lymphedema, and fibromyalgia.  (Tr. 417.)  Dr. Kirsch discussed knee-replacement surgery with Plaintiff.  (Tr. 417.)  Plaintiff expressed interest in the procedure given the significant benefit she received from having her left knee replaced.  (Tr. 417.)  Dr. Kirsch directed Plaintiff to "return in October for scheduling." (Tr. 417.)

Plaintiff had a follow-up appointment with Dr. Schmidt at the lymphedema clinic in the beginning of October. (Tr. 513-15.) Dr. Schmidt noted that Plaintiff had travelled to Florida in May for an accounting competition and "finished fifth which is very commendable." (Tr. 514.) Plaintiff hoped to get a job when she graduated in December. (Tr. 514.) Plaintiff's "Velcro compression devices" had worn out and "she ha[d] not used any compression for the last two to three weeks, resulting in increased swelling." (Tr. 513.) Plaintiff had also "gained significant weight since her last evaluation." (Tr. 513.) In addition, Plaintiff continued to have "swelling in the left upper extremity," but it appeared unchanged from Plaintiff's previous visit in April. (Tr. 513-14.)

Plaintiff's "right below-knee measurements ha[d] increased by up to 5 cm and the left below-knee measurements by up to 3 cm." (Tr. 514.) Plaintiff's "bilateral thigh measurements [we]re also up to several centimeters larger." (Tr. 514.) Plaintiff's skin "continue[d] to be in fairly good condition." (Tr. 514.) Dr. Schmidt attributed Plaintiff's increased leg measurements to "not using compression over the last several weeks and also gaining weight." (Tr. 514.) Dr. Schmidt prescribed new compression devices and directed Plaintiff to return in six months. (Tr. 514-15.)

Plaintiff also met with Dr. Kirsch again in the beginning of October. (Tr. 416.) She continued to experience pain in her right knee, rating it at 6 out of 10. (Tr. 416.) Plaintiff was "frustrated with her knee giving out, her safety concerns, and the disability and limitations that it places on her lifestyle and inability to exercise." (Tr. 416.) Upon examination, Plaintiff had "diffuse edema from the knee distally in both legs"; was "[t]ender to palpation over the medial joint line" and "McMurray's cause[d] exquisite

pain in the medial knee." (Tr. 416.) Plaintiff was able to extend her right knee fully. (Tr. 416.) Dr. Kirsch further discussed a total right-knee arthroplasty with Plaintiff and she decided to proceed. (Tr. 416.)

At the end of October, Plaintiff went to the emergency room with complaints of lightheadedness and numbness in her left arm. (Tr. 413; *see* Tr. 467-89.) Plaintiff reported "ha[ving] a band of pain in her proximal humerus that is constant" with "some intermittent numbness from the band on her mid or proximal humerus all the way on all sides of her arm, forearm, and hand." (Tr. 413.) Plaintiff had been experiencing this for approximately three weeks. (Tr. 413.) Plaintiff also "report[ed] some associated lightheadedness and feeling weak. Whenever she does activity like walking or doing work, she feels like she is getting lightheaded, [and] at times feels like she is going to pass out, however, she has had no syncope." (Tr. 413.) Plaintiff's symptoms improved with rest. (Tr. 413.) Plaintiff also reported having a constant headache. (Tr. 413.)

Upon examination, Plaintiff's cervical spine was nontender. (Tr. 415.) Plaintiff was "tender over the lateral proximal humerus" and did "have numbness reproduction with palpation in this area." (Tr. 415.) Plaintiff's cranial nerves were intact bilaterally; she had 5 out of 5 strength bilaterally in her upper extremities; and she had "+2 out of 4 deep tendon reflexes biceps and triceps bilateral upper extremity." (Tr. 415.)

Plaintiff's paresthesia was thought to be separate from the lightheadedness she was experiencing. (Tr. 415.) The treatment provider considered that Plaintiff may be "having a peripheral nerve entrapment as [the] exam does create a reproducible symptomology" and it was suggested that Plaintiff obtain an electromyography ("EMG")

and be seen in neurology. (Tr. 415.) Plaintiff's elevated blood pressure was also considered as a possible source of her lightheadedness. (Tr. 415.)

Plaintiff returned for a follow-up appointment approximately one week later. (Tr. 410.) Plaintiff's blood pressure had "improved a little bit." (Tr. 410.) She was, however, "continu[ing] to have a significant amount of headache[s] and lightheadedness." (Tr. 410.) Plaintiff was noted to have "chronic lower extremity lymphedema" and there was "no change in her baseline swelling." (Tr. 410; *see* Tr. 412.) Plaintiff's BMI was 44. (Tr. 411.) Plaintiff's cranial nerves were intact and her gait was normal. (Tr. 412.)

The treatment provider noted that Plaintiff's electrocardiogram "was not concerning" and repeated blood tests were "all . . . reassuring." (Tr. 412.) Due to Plaintiff's continued lightheadedness, however, further evaluation was recommended and an echocardiogram ordered. (Tr. 412.) Similarly, while a CT scan of Plaintiff's head was "reassuring," further evaluation of Plaintiff's headaches was also recommended and a brain MRI ordered. (Tr. 412.) It was noted that Plaintiff had an appointment with neurology in approximately one month to discuss both the numbness in her left arm and headaches. (Tr. 412.)

Plaintiff saw Dr. Schmidt a few days later to address increased swelling in her extremities. (Tr. 509-10.) Upon examination, Dr. Schmidt noted puffiness in both of Plaintiff's upper extremities, less on the right than the left. (Tr. 511.) Overall, Plaintiff's upper-extremity measurements were "a little higher" than the measurements taken in April, "but generally by less than a centimeter." (Tr. 511.) Plaintiff's lower extremities

11

had increased by "a centimeter or two" since the previous month's measurement. (Tr. 511.) Plaintiff's skin continued to be in "excellent condition." (Tr. 511.) Dr. Schmidt ordered "a CT scan to make sure there are no obstructing le[s]ions." (Tr. 511.)

When Plaintiff followed up approximately two weeks later, Dr. Schmidt noted that the CT scan did "not show any obstructing lesions." (Tr. 507.) Plaintiff did "have a fatty liver." (Tr. 507.) Based on the "left greater than right upper extremity swelling," Dr. Schmidt ordered a lymphoscintigraphy to be completed in January with evaluation of Plaintiff's compression program to follow. (Tr. 507.) Dr. Schmidt noted that Plaintiff "needs to continue her efforts at exercise and weight loss." (Tr. 507.)

Plaintiff saw Dr. Nistler the same day for a general exam, but also repeated her concerns with lightheadedness and numbness in her left arm. (Tr. 406.) Plaintiff also reported "daily migraine headaches for the last week which she characterize[d] as left-sided headache pain associated with facial numbness on the left side." (Tr. 406.) Plaintiff had not been able to attend school for most of the month due to her symptoms and requested a note stating she had been absent for illness. (Tr. 406.) Plaintiff also reported that "her lymphedema has worsened." (Tr. 406.) Plaintiff rated her pain at 9 out of 10. (Tr. 408.)

Dr. Nistler noted that the echocardiogram "showed mild concentric [left ventricular hypertrophy] but was otherwise negative" and the brain MRI was "normal." (Tr. 406; *see* Tr. 382-85, 490-91.) Dr. Nistler also noted the upcoming appointment with neurology. (Tr. 406.) Upon examination, Plaintiff had "significant edema of her left hand which appear[ed] to be greater than usual." (Tr. 408.) Dr. Nistler noted that

Plaintiff had "her lymphedema wrap dressings in place on both lower legs." (Tr. 408.) Plaintiff's "[m]ovements were symmetrical"; she had "[n]ormal movements in all 4 extremities"; her "[d]eep tendon reflexes [we]re 2+ and equal"; and her "[g]ait and stance [were] normal." (Tr. 408.) Plaintiff's BMI was 42.5. (Tr. 408.)

Dr. Nistler started Plaintiff on lisinopril[3], "both for better control of her blood pressure" and "also as a migraine prophylactic medicine." (Tr. 408.) Dr. Nistler also recommended that Plaintiff use both sumatriptan[4] and ibuprofen together when she experiences a migraine. (Tr. 408.) In addition, Dr. Nistler provided Plaintiff with a note stating that she could "attempt to return to work and school as of 11/25/2013." (Tr. 408.)

Plaintiff met with neurology in the beginning of December. (Tr. 402.) Plaintiff described "having a squeezing sensation in a band-like distribution around the biceps and triceps of the left arm that seems to give her a feeling of radiation of numbness, tingling and pain into the left hand. All the digits are numb." (Tr. 402.) Plaintiff's "right hand also ha[d] that sense of numbness in the fingers. . . . There is not that sense of squeezing in the right upper arm, however," and there was "no radiating neck pain." (Tr. 402.) It was noted that Plaintiff had "idiopathic lymphedema of the left upper and bilateral lower extremities." (Tr. 402; *see* Tr. 404.)

The neurologist noted that, while the MRI of Plaintiff's cervical spine showed "some mild degenerative changes," none of them "correlate[d]" with Plaintiff's

---

[3] "Lisinopril is used alone or in combination with other medications to treat high blood pressure." *Lisinopril*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a692051 html (last visited September 14, 2018).
[4] Sumatriptan is used to treat migraine headaches. *Sumatriptan*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601116 html (last visited September 14, 2018).

symptoms.  (Tr. 402.)  Similarly, the brain MRI "show[ed] no etiology" for the upper-extremity symptoms.  (Tr. 402.)  Plaintiff's motor exam was "5 out of 5 in the proximal and distal muscles in [her] upper and lower extremities."  (Tr. 404.)  Plaintiff "show[ed] no nystagmus, tremor or pronator drift, and [her] gait [wa]s steady without the use of an ambulatory aid."  (Tr. 404.)  Plaintiff's deep tendon reflexes were "[a]bsent in the upper and lower extremities."  (Tr. 404.)  The neurologist ordered an EMG of Plaintiff's upper extremities with further recommendations to follow pending the results.  (Tr. 404.)

## B.  2014

The EMG was conducted in early January 2014.  (Tr. 401, 757-59, 772; *see* Tr. 398-400.)  The results were normal with "no electrodiagnostic evidence of a radiculopathy, plexopathy, neuropathy, or myopathy."  (Tr. 401.)

In mid-January, Plaintiff saw Dr. Schmidt at the lymphedema clinic.  (Tr. 503-05.)  Plaintiff underwent a lymphoscintigraphy of her upper extremities, which confirmed a diagnosis of lymphedema in her left upper extremity as well as her lower extremities.  (Tr. 504.)  Dr. Schmidt prescribed a compression sleeve and glove for Plaintiff's left arm.  (Tr. 504.)  Plaintiff's lower extremities were "a little bit lower" when compared to measurements taken approximately two months earlier.  (Tr. 504.)  Dr. Schmidt "encouraged [Plaintiff] to begin an exercise program[ and] discussed [using] a recumbent bicycle."  (Tr. 504.)  Dr. Schmidt also "encouraged [Plaintiff] to lose weight."  (Tr. 504.)  Plaintiff was interested in aquatic therapy, but "finances [we]re a significant concern."  (Tr. 504.)

Plaintiff had a preoperative physical with Dr. Nistler at the end of April. (Tr. 768-771.) Plaintiff reported that her "left arm tightness" had "largely resolved," although she still had "some tingling in her arms." (Tr. 768.) Plaintiff also reported that she completed her accounting degree and would "be attending a conference in Indianapolis representing her school in the business department." (Tr. 768; *see* Tr. 857.) Upon examination, Plaintiff had normal movement in all four extremities; her "[d]eep tendon reflexes [we]re 2+ and equal"; and her gait and stance were "normal." (Tr. 770.) Plaintiff's BMI was 42.7. (Tr. 770.) Dr. Nistler cleared Plaintiff for surgery. (Tr. 770.)

Plaintiff underwent a successful total right knee arthroplasty in mid-May. (Tr. 773-90; *see* Tr. 766-67.) During a follow-up appointment approximately two weeks later, Plaintiff reported that her right knee was faring "much better with regard to pain management," but she was "still having a great deal of pain." (Tr. 766.) Plaintiff was currently using a walker and doing physical therapy at home. (Tr. 766.) Plaintiff had "approximately 75 degrees of flexion and lack[ed] terminal extension by approximately 5 degrees." (Tr. 766.) Plaintiff had "no signs of hemarthrosis, but she d[id] have moderate effusion and lower extremity edema along with a history of lymphedema." (Tr. 766.) Plaintiff's gait was steady with the walker. (Tr. 766.) Plaintiff was given a referral to a rehabilitation program through the Mayo Clinic and instructed to return in four weeks. (Tr. 766.)

Plaintiff returned about three weeks later. (Tr. 764.) It was noted that Plaintiff had experienced "increase[ed] pain, swelling, erythema and warmth," causing her to seek treatment for infection. (Tr. 764; *see* Tr. 677, 680, 739-40.) Plaintiff's infection

symptoms had subsided, but she "continue[d] to have severe swelling with decreased range of motion," losing "5-10 degrees of range of motion." (Tr. 764.) Plaintiff attributed the loss of motion to not being able to perform pool exercises since her surgery. (Tr. 764.) Plaintiff's history of lymphedema was also noted. (Tr. 764.)

Upon examination, Plaintiff had "significant effusion in her knee." (Tr. 764.) It was, however, "difficult to determine if this is effusion or if it is part of her lymphedema process." (Tr. 764.) Plaintiff's flexion was "approximately 85 degrees, and she lack[ed] terminal extension by approximately 5 degrees." (Tr. 764.) Deep tendon reflexes were not tested "due to pain and lymphedema." (Tr. 764.) Plaintiff "was instructed that she may get back into the pool and should work hard at physical therapy to try to regain range of motion." (Tr. 764.) Plaintiff was also instructed to return in two weeks to have her range of motion evaluated. (Tr. 764.)

When Plaintiff was next seen around the middle of July, her range of motion had "improved about 10 degrees." (Tr. 763.) Plaintiff's flexion was just over 90 degrees. (Tr. 763.) Arrangements were made for Plaintiff to use a driving simulator to "assess whether she is ready to drive." (Tr. 763.)

During the months of June and July, Plaintiff participated in physical therapy to address limited range of motion, strength, and ambulation. (Tr. 701-08, 718-47.) The goals of therapy were to ambulate without an assistive device within 12 weeks, ascend and descend 5 steps in six weeks, and perform housework and yard activities without restriction within 8 weeks. (Tr. 747.) Plaintiff had a physical therapy session approximately every three days. (Tr. 718-47.) From the middle of June through the

middle of July, Plaintiff was using a walker.  (Tr. 729, 731, 733, 734, 736, 737, 739, 740, 742, 743, 745, 746.)  Plaintiff rated her pain between 1 and 8 out of 10, most commonly reporting her pain at 5.  (*Compare* Tr. 723, 724, 726, 734, 736, 737 *with* 718, 719, 721, 728, 729, 731, 733, 739, 740, 742, 743, 745.)  Plaintiff's pain generally decreased over time with occasional spikes in increased pain.   While Plaintiff's swelling improved around the end of June into July, she experienced increased swelling again around the middle of July.  (*Compare* Tr. 728, 729, 731, 733 *with* Tr. 723-24, 726.)  Towards the end of July, Plaintiff's swelling began to decrease again.  (Tr. 719, 721.)  Around the middle of July, Plaintiff reported that "she had a busy weekend" in which she "drove up to the cities for a movie and then  . . . down to Iowa for [a] conference."  (Tr. 724.)  Plaintiff felt "a little stiff" as a result.  (Tr. 724.)   Overall, Plaintiff reported decreased pain at the end of her sessions.  (Tr. 719, 720, 721, 724, 725, 727, 729, 730, 732, 733, 735, 736, 738, 741, 742, 744, 745.)  Plaintiff's range of motion increased from 93 to 108 degrees.  (Tr. 746, 719.)

For the month of July, Plaintiff also participated in occupational therapy for her lymphedema, attending approximately two sessions per week.  (Tr. 684-701.)  Plaintiff primarily received manual therapy during these sessions.  (Tr. 690, 692, 694, 696, 698, 700, 701.)  During a session in the middle of July, Plaintiff reported that she would "be driving a total of [four] hours tonight."  (Tr. 692.)

In the beginning of August, Plaintiff was "doing much better and [her] lymphedema [wa]s much improved."  (Tr. 762.)  It was noted that "[t]he water therapy

[wa]s helping her quite nicely." (Tr. 762.) Plaintiff's flexion was approximately 100 degrees. (Tr. 762.)

Plaintiff continued with physical therapy through the month of August. (Tr. 709-17.) There was a two-week period in which she was unable to attend due to illness. (Tr. 709-10.) Plaintiff rated her pain between 4 and 7 out of 10. (Tr. 709, 711, 712, 714, 716.) Plaintiff's pain was the highest "after too much activity" on a weekend. (Tr. 711.) Again, Plaintiff's pain generally decreased at the end of her sessions. (Tr. 711, 714, 715, 717.) Plaintiff's range of motion increased from 106 to 113 degrees. (Tr. 709, 716.)

In the beginning of September, Plaintiff presented at the emergency room with complaints of increased pain behind her right knee that "moves up the leg" and swelling. (Tr. 844, 847.) Plaintiff's pain had been worsening over the course of the past four weeks. (Tr. 844.) Upon examination, Plaintiff had normal range of motion in both of her lower extremities, but tenderness and swelling in her right knee. (Tr. 846.) Plaintiff's BMI was 42.13. (Tr. 846.) Plaintiff was discharged with oxycodone for her knee pain. (Tr. 846-47.)

One week later, Plaintiff had a postoperative check-up regarding her right knee. (Tr. 839, 886.) Plaintiff reported that she was still experiencing "some slight discomfort" but felt better than she did after her previous knee surgery. (Tr. 839; *accord* Tr. 886.) Plaintiff had "near full extension, flexion just about 95 degrees" and there was "[n]o redness or new swelling of the extremity." (Tr. 839; *accord* Tr. 886.) It was also noted that Plaintiff "had near pain free range of motion and sitting position." (Tr. 839; *accord* Tr. 886.) Plaintiff was advised that "she is probably going to have a little bit rockier

course" and should continue with rehabilitation given her chronic lymphedema." (Tr. 839; *accord* Tr. 886.) Plaintiff was directed to follow up in eight months and could engage in "[a]ctivities . . . as tolerated." (Tr. 839; *accord* Tr. 886.)

The same day, Plaintiff also met with a podiatrist. (Tr. 837, 887.) The podiatrist noted that Plaintiff had not been seen for "over [three] years." (Tr. 837; *accord* Tr. 887.) Plaintiff rated her pain between 8 and 10 out of 10. (Tr. 837, 887.) The podiatrist noted that Plaintiff had "[m]arked edema" and ambulated with "some hesitancy." (Tr. 837; *accord* Tr. 887.) Plaintiff's range of motion and muscle strength in her feet and ankles were within normal limits. (Tr. 837, 887.) Plaintiff was advised regarding weight management, stretching, strengthening, and supportive shoes. (Tr. 837, 887.) Plaintiff was directed to return in one week for possible new orthotics. (Tr. 837-38, 887-88; *see* Tr. 833-34, 892.)

The following week, Plaintiff was seen by Dr. Nistler for a "renewal of her medical opinion statement indicating that [Plaintiff] is currently unable to return to employment due to multiple health difficulties." (Tr. 834; *accord* Tr. 889.) Dr. Nistler noted that Plaintiff was "still recovering from the right knee replacement as it has exacerbated both her lymphedema and fibromyalgia pain further limiting her mobility." (Tr. 834; *accord* Tr. 889.)

Dr. Nistler noted that Plaintiff's pain was 5 out of 10 based on her lymphedema, fibromyalgia, right knee, and cervical disk disease. (Tr. 836, 891.) Plaintiff was "able to stand with some difficulty due to her right knee pain" and did "walk with a limp favoring the right knee." (Tr. 836; *accord* Tr. 891.) Plaintiff also had "significant lymphedema

despite her having compression dressings in place." (Tr. 836; *accord* Tr. 891.) Plaintiff

was able to "sit[] comfortably in the exam room." (Tr. 836; *accord* Tr. 891.) Plaintiff's

BMI was 44.7. (Tr. 836, 891.) Dr. Nistler completed the "medical opinion statement

indicating [that Plaintiff] is not yet able to be employed for the foreseeable future," and

directed Plaintiff to return in six months. (Tr. 836; *accord* Tr. 891.)

## C. 2015

In the middle of January, Plaintiff was seen by an occupational therapist to address

bilateral ulnar neuritis. (Tr. 853.) Plaintiff reported that "[a]ctivities that aggravate [her]

symptoms include waking up in the morning, at the end of the day, sleeping at night,

[and] holding [her] elbows in any flexed position." (Tr. 853.) Plaintiff reported that rest

helped relieve her symptoms. (Tr. 853.) Plaintiff was not able to provide a numerical

rating for her pain. (Tr. 853.) Plaintiff reported that she was able to perform activities of

daily living independently "but with difficulty as []she is only using one hand for

activities due to pain and dysfunction of the involved/affected hand." (Tr. 853.)

Upon examination, Plaintiff had "intermittent bilateral numbness/tingling from

elbows to digits 4-5, especially when elbows are held in a flexed position." (Tr. 854.) It

was also noted that Plaintiff had lymphedema and bilateral upper extremity edema, which

Plaintiff reported affected her ulnar neuritis. (Tr. 854.) Plaintiff had no flexion,

extension, or opposition lags in her fingers. (Tr. 855.) Plaintiff had normal range of

motion in her wrists and elbows. (Tr. 855.)

Plaintiff was asked about her ability to perform certain activities. Plaintiff had

moderate difficulty using a knife to cut food and carrying a shopping bag/briefcase. (Tr.

855.)   Plaintiff had severe difficulty opening a tight or new jar and engaging in recreational activities.  (Tr. 855.)  Plaintiff was unable to wash her back or do heavy household chores.  (Tr. 855.)  Plaintiff reported that her symptoms interfered "quite a bit" with her social activities and she was "very limited" in her work and other regular daily activities.  (Tr. 855.)

Plaintiff was also asked about the severity of her symptoms over the course of the past week.  Plaintiff described her pain as moderate.  (Tr. 855.)  The tingling Plaintiff experienced was extreme.  (Tr. 855.)  When asked about any difficulties sleeping, Plaintiff reported that her pain was so great that she was unable to sleep.  (Tr. 855.)

The occupational therapist assessed Plaintiff with bilateral cubital tunnel syndrome and hand paresthesias.  (Tr. 855.)  Plaintiff was instructed on exercises and protection techniques and given a set of elbow pads.  (Tr. 855.)

Plaintiff returned to Dr. Nistler towards the end of February "for review of her continued chronic health problems and renewal of her medical opinion statement so she c[ould] continue to receive county benefits . . . for health insurance, some cash assistance and food stamp assistance."  (Tr. 829; *accord* Tr. 893.)  Dr. Nistler noted that, in the interim, Plaintiff had been seen in the spine center of the Mayo Clinic "for evaluation of her chronic neck pain and bilateral forearm numbness" and "was determined to have bilateral ulnar neuropathies."  (Tr. 829; *accord* Tr. 893.)  Plaintiff had also been seen in the lymphedema clinic "every [six] months and no further treatment is available."  (Tr. 829; *accord* Tr. 893.)

Additionally, Dr. Nistler noted as follows:

> [Plaintiff] feels that her persistent lymphedema of her lower
> extremities and left forearm are limiting her ability to return
> to work in that she cannot stand or walk for more than [two]
> minutes at a time without increased pain causing her to have
> to sit down. She notes the pain can become severe enough
> that she feels nauseated. She also suffers from fibromyalgia,
> which affects both upper and lower extremities and limits her
> ability to sit. She feels that she would only be able to sit for
> 20 or 30 minutes at a time without discomfort.

(Tr. 829; *accord* Tr. 893.)

Upon examination, Plaintiff rated her pain at "5 out of 10 relevant to her lymphedema." (Tr. 831; *accord* Tr. 895.) Plaintiff was "sitting comfortably in the exam room" and was "able to stand and walk." (Tr. 831; *accord* Tr. 895.) Plaintiff's BMI was 44. (Tr. 831, 895.) Dr. Nistler renewed the medical opinion statement and "request[ed a] functional capacity assessment per our rehabilitation services to assess whether this patient would at some point be able to return to work with her current limitations." (Tr. 831; *accord* Tr. 895.) Dr. Nistler directed Plaintiff to follow up in another six months. (Tr. 831, 895.)

Plaintiff had a follow-up appointment with Dr. Schmidt at the lymphedema clinic at the beginning of September. (Tr. 857.) Plaintiff reported that "she has done quite well" since her last appointment in December 2014. (Tr. 857.) Plaintiff's lymphedema was "well managed" and she had "not had any infections or skin complications." (Tr. 857.) Plaintiff had also been "more active" and lost approximately 15 pounds. (Tr. 857.) Plaintiff reported that she "has been riding with truck drivers which she enjoys on the over-the-road routes" and occasionally attending a YMCA to swim and walk. (Tr. 857-58.)

Dr. Schmidt observed that Plaintiff "continue[d] to have puffiness in the left upper extremity[,] especially the hand." (Tr. 858.) Plaintiff's "left upper extremity continue[d] to be [one] to [two centimeters] larger than the right." (Tr. 858.) Plaintiff's upper extremities were both "a little higher" than the measurements taken last December. (Tr. 858.) Plaintiff's lower extremities were "fairly symmetrical" and had "decreased by [one] to [two centimeters]" compared to the measurements taken last December. (Tr. 858.) Dr. Schmidt encouraged Plaintiff to continue her efforts with weight loss, including more regular attendance at the YMCA, and instructed her to follow up in 6 to 12 months. (Tr. 858.)

Plaintiff returned to Dr. Nistler in the beginning of November. (Tr. 917.) Plaintiff's primary concern was continuing bilateral arm pain "as well as further management of her fibromyalgia and lymphedema." (Tr. 917.) Plaintiff also recently began experiencing an increased heart rate, additional headaches, and difficulty sleeping. (Tr. 917.) In addition, Plaintiff requested renewal of her medical opinion statement for county benefits. (Tr. 917.) Plaintiff rated her pain at 8 out of 10. (Tr. 919.) Plaintiff's BMI was 43. (Tr. 919.) Dr. Nistler noted that Plaintiff was "sitting comfortably in the exam room" and completed the medical opinion statement. (Tr. 919.)

**D. 2016**

Plaintiff saw Dr. Nistler again in mid-January 2016 regarding her bilateral arm pain. (Tr. 921.) Dr. Nistler noted that a repeat EMG done a few days before was again normal and Plaintiff had been referred to vascular medicine for a consultation. (Tr. 921; *see* Tr. 920, 936-38; *see also* Tr. 926.) Dr. Nistler noted that Plaintiff "has remained

unable to work largely because of her consistent pain." (Tr. 921.) Upon examination, Plaintiff had "significant lymphedema of her upper extremities greater on the left than the right." (Tr. 923.) Plaintiff rated her pain at 6 out of 10, and her BMI was 43.5. (Tr. 923.) Dr. Nistler directed Plaintiff to contact her after the consultation with vascular medicine "to determine if we can fill out her long-term disability application paperwork." (Tr. 923.)

In early February, Plaintiff had a consultation with the vascular center at the Mayo Clinic to address the symptoms in her upper arms. (Tr. 860-65; *see* Tr. 926.) Plaintiff reported "experiencing numbness and tingling in her wrists and hands when she flexes up both of her arms or sleeps on her arms during the evening hours." (Tr. 860; *see* Tr. 861.) Plaintiff typically slept on her right side as opposed to her left due to increased symptoms. (Tr. 860.) Plaintiff reported "having a squeezing-like sensation in the distribution around her biceps and triceps of both arms, with radiation of numbness and tingling and pain into both hands and fingers." (Tr. 860.) Plaintiff also experienced numbness in the fingers of both hands. (Tr. 860; *see* Tr. 861.) Plaintiff recently tried physical therapy without success. (Tr. 860.) Plaintiff rated her pain at 7 out of 10. (Tr. 862.)

It was noted that the EMG taken in January was normal and there was "no electrodiagnostic evidence of radiculopathy, plexopathy, neuropathy or myopathy." (Tr. 861; *see* Tr. 920, 936-38.) Plaintiff's muscle strength was normal and she "ambulate[d] normally with no noted deficits." (Tr. 863.) Plaintiff's extremities were "warm" and "well perfused." (Tr. 863.) Her lymphedema was noted. (Tr. 863.) Plaintiff's BMI was

42.44. (Tr. 863.) It was recommended that Plaintiff undergo an ultrasound to rule out thoracic outlet syndrome and consult with neurology. (Tr. 864-65.) Subsequent testing found "[n]o evidence of 'fixed' upper extremity arterial occlusive disease." (Tr. 866; *see* Tr. 873.)

Plaintiff consulted with neurology around the middle of February. (Tr. 873-74.) In addition to describing her symptoms, Plaintiff reported during this consultation that she "recently started part-time work at H&R Block but her symptoms ma[d]e work difficult." (Tr. 873.) Plaintiff's neurological exam was normal. (Tr. 874.) The tone, strength, and reflexes in her upper extremities were normal and "[t]here was no muscle atrophy or fasciculations." (Tr. 874.) Plaintiff's limbs were "well perfused" and sensory testing was normal. (Tr. 874.) "Tinel sign at the wrist and elbow was negative." (Tr. 874.)

There was no "obvious neurological explanation for [Plaintiff's] symptoms." (Tr. 874.) Plaintiff's fibromyalgia was thought to possibly be exacerbating her symptoms and it was recommended that an MRI of Plaintiff's spinal cord be repeated "to rule out cord impingement or central cord lesion as an alternative explanation for her symptoms." (Tr. 874.)

The cervical MRI showed "progressive circumferential dis[k] bulging and marginal osteophytes at C4-C5," which "result[ed] in moderate spinal stenosis and severe right C5 neural foraminal narrowing." (Tr. 876.) There was "[n]o associated spinal cord signal abnormality." (Tr. 876.) The EMG was also repeated and was again normal. (Tr. 877.)

Plaintiff's next appointment with Dr. Nistler was in March. (Tr. 933.) Plaintiff reported that she "has been able to do episodic work such as v[o]lunteering at her college when she was in school but now more recently working as a tax [preparer] on an intermittent basis noting that she has been able to change positions, stand up, sit down, or walk for a few minutes at a time every 30-60 minutes." (Tr. 933; *see* Tr. 941.) Plaintiff rated her pain at 8 out of 10 and her BMI was 44.1. (Tr. 935.) Dr. Nistler noted the results of the recent MRI and EMG. (Tr. 933.) Dr. Nistler noted that Plaintiff has "multiple diagnoses" impairing her ability to function, including but not limited to fibromyalgia, lymphedema in her upper and lower extremities, and cervical disk disease. (Tr. 933.) Dr. Nistler concluded that Plaintiff was "[d]isabled . . . due to multiple etiologies" and completed disability paperwork for her. (Tr. 935.)

Plaintiff had a follow-up appointment in the lymphedema clinic with Dr. Schmidt in April. (Tr. 941.) Plaintiff reported that she was currently doing seasonal work as a tax preparer for H&R Block. (Tr. 941.) Plaintiff felt that her "swelling may be a little bit worse due to weight gain over the winter." (Tr. 941.) Plaintiff continued her efforts to lose weight, swimming at the YMCA approximately once per week. (Tr. 941.) Plaintiff "hop[ed] to be more active with the warmer weather." (Tr. 941.) Overall, however, Plaintiff was "feeling better." (Tr. 942.) "[A] professional massage therapist/friend ha[d] been assisting with weekly massage treatments" and encouraging Plaintiff to exercise more. (Tr. 942.)

Upon examination, there was "some puffiness" in Plaintiff's upper extremities, with her right arm a little greater than the left. (Tr. 942.) There were "not any significant

changes" in Plaintiff's lower extremities since the measurements taken in September 2015.  (Tr. 942.)  No changes were made to Plaintiff's compression program and Dr. Schmidt encouraged Plaintiff to continue her efforts at weight loss.  (Tr. 943.)

Plaintiff was seen in May with complaints of pain in her right knee after falling down a flight of stairs approximately two months earlier.  (Tr. 902.)  Plaintiff reported that she had been "doing fine up until she fell."  (Tr. 902.)  Plaintiff's knee was sore since the fall, but was improving.  (Tr. 902.)  Plaintiff's knee was tender to palpation, but she was able to extend it fully and had "flexion past 90 degrees."  (Tr. 902.)  Plaintiff had "5 out of 5 strength with resisted knee extensions."  (Tr. 902.)  Plaintiff declined x-rays for further evaluation.  (Tr. 902.)

At the end of August, Plaintiff returned to Dr. Nistler "for renewal of her medical opinion statement indicating that she is not currently able to work."  (Tr. 903.)  Dr. Nistler noted that Plaintiff now attributed her inability to work "primarily to her bilateral ulnar neuropathy."  (Tr. 902.)  Dr. Nistler noted that Plaintiff had consulted with neurology and had an EMG study done, "which did not show evidence of neuropathy." (Tr. 903.)  Plaintiff reported that she had "recently been able to do some volunteer work at her college, which involve[d] working for a 6-hour time frame for about 4 days per week for 2 weeks."  (Tr. 903.)  Plaintiff reported that, "although she was able to do this, . . . the pain in her forearms limits her ability to work continuously and limits her ability to stand or walk."  (Tr. 903.)

Dr. Nistler noted that Plaintiff had previously sent a "form requesting a functional capacity assessment," indicating Plaintiff's "specific limitations."  (Tr. 903.)  Plaintiff

was, however, unable to afford a residual functional capacity assessment and Dr. Nistler informed her that she was "unable to specify for her the items requested in the form." (Tr. 903.)

Dr. Nistler observed that Plaintiff was "sitting comfortably in the exam room" and her gait and stance were normal. (Tr. 905.) Plaintiff rated the pain in forearms at 7 out of 10. (Tr. 905.) Plaintiff's BMI was 43.6. (Tr. 905.) Dr. Nistler requested reevaluation of Plaintiff's forearm pain and numbness by neurology and noted that she "will strongly encourage [Plaintiff] to consider allowing me to refer her to rehab services" for an evaluation of her functional capacity. (Tr. 905.)

Plaintiff was reevaluated by neurology in the beginning of September. (Tr. 906.) Plaintiff reported that "[s]he currently has numbness and tingling to bilateral elbows that migrates down to all fingers, left greater than the right." (Tr. 906.) Plaintiff described "the sensation as squeezing when it is numb and then pain." (Tr. 906.) Plaintiff's symptoms depended upon "how she situates her arm. If she raises her arms up, the numbness and tingling is constant." (Tr. 906.) Plaintiff stated that once, in the spring, her "left arm was numb for about 30 minutes," but this has not reoccurred. (Tr. 906.) Plaintiff felt the numbness, pain, and weakness in her hands was getting worse. (Tr. 906.) Plaintiff rated her pain at 5 out of 10. (Tr. 908.)

Upon examination, Plaintiff had edema in her extremities bilaterally. (Tr. 909.) Plaintiff had was not tender to palpation "along paraspinal muscle areas including the cervical spine." (Tr. 909.) Plaintiff had tenderness in her right shoulder with active range of motion. (Tr. 909.) Plaintiff had full motor strength in both her upper and lower

extremities. (Tr. 909.) Plaintiff's gait was steady. (Tr. 909.) Her deep tendon reflexes, however, were "diminished." (Tr. 909.) Another EMG of Plaintiff's upper extremities was ordered and she was referred to physical therapy for pain relief. (Tr. 909.)

Plaintiff was also seen by podiatry twice in September for foot and ankle swelling. (Tr. 957, 960.) It was noted that Plaintiff "ha[s] been challenged with these issues for an extended period of time" and had "some success" with the lymphedema clinic. (Tr. 957; *see* Tr. 960.) Plaintiff reported that increased walking aggravates her symptoms. (Tr. 960.) Plaintiff rated her pain between 1 and 3 out of 10. (Tr. 957, 960.) Upon examination, Plaintiff had current edema in both of her feet and discomfort in her left foot. (Tr. 961.) Plaintiff's range of motion and muscle strength were within normal limits. (Tr. 961.) Plaintiff was diagnosed with edema, plantar fasciitis, a heel spur, midfoot arthralgia, and forefoot metatarsalgia with lymphedema in her left foot. (Tr. 961.) Plaintiff was given a boot for her left foot. (Tr. 961.) When Plaintiff returned for a follow-up approximately one week later, she had "some moderate swelling bilateral[ly]." (Tr. 957.) Her muscle strength continued to be within normal limits. (Tr. 957.)

Plaintiff followed up with Dr. Schmidt at the lymphedema clinic in October. (Tr. 944.) Plaintiff reported that the swelling in her feet had gotten worse. (Tr. 944.) Plaintiff was still receiving "weekly manual lymph drainage massage treatments," which she found "very beneficial." (Tr. 944.) Plaintiff continued to experience difficulties with weight management, reporting that she was no longer able to swim at the YMCA because "she is working more hours than she did in the past." (Tr. 944.) Plaintiff also continued to have trouble with pain and tingling/numbness in her upper extremities. (Tr. 945.)

Upon examination, Dr. Schmidt noted that Plaintiff "continue[d] to have large upper extremities with the measurements of the left being just slightly larger than the right." (Tr. 945.) Plaintiff's left hand was also puffy. (Tr. 945.) With respect to her lower extremities, Plaintiff's measurements were "generally [one] to [three centimeters] larger distally" and "about [one centimeter] smaller" proximally. (Tr. 945.) Dr. Schmidt noted that "[a]dvancing [Plaintiff's] compression program is quite challenging as she has difficulty reaching her feet and in the past has not particularly liked compression on her legs at night." (Tr. 945.) Dr. Schmidt advised Plaintiff to use her toe caps and knee-high compression stockings at night and continue her efforts to lose weight. (Tr. 946.)

Plaintiff saw Dr. Nistler in mid-October for an annual exam and renewal of her medical opinion statement. (Tr. 950.) Dr. Nistler noted that Plaintiff "remains unable to work due to a combination of her cervical dis[k] disease, her fibromyalgia and her upper and lower extremity idiopathic lymphedema." (Tr. 950.) Plaintiff reported "chronic pain in all of her joints and muscles." (Tr. 951.) Upon examination, Plaintiff had "[g]ood range of motion of all major joints" and there were "[n]o obvious joint abnormalities." (Tr. 954.) Dr. Nistler observed that Plaintiff's "[e]xtremities [were] without clubbing cyanosis or edema." (Tr. 954.) Plaintiff's gait and stance were normal. (Tr. 954.) Dr. Nistler renewed Plaintiff's medical opinion statement. (Tr. 954.)

### IV. DR. NISTLER'S OPINIONS

The record contains three medical opinions from Dr. Nistler: two shorter and one longer. (Tr. 880-83, 916, 974, 929-32.)

**A. November 2015 and October 2016 Opinions**

In these two shorter opinions issued in November 2015 and October 2016, Dr. Nistler opined that Plaintiff's diagnoses collectively included bilateral ulnar neuropathy, cervical disk disease, fibromyalgia, and lymphedema. (Tr. 916, 974.) Dr. Nistler checked "other" and did not indicate how long Plaintiff's conditions were likely to last. (Tr. 916, 974.) When asked about any permanent limitations Plaintiff had, Dr. Nistler listed "limited mobility and chronic pain." (Tr. 916; *accord* Tr. 974.) Dr. Nistler opined that Plaintiff would not be able to work in the foreseeable future. (Tr. 916, 974.)

**B. March 2016 Opinion**

In March 2016, Dr. Nistler completed a more extensive opinion form about Plaintiff's physical ability to do work-related activities. (Tr. 880-83, 929-32.) Dr. Nistler opined that the maximum amount of weight Plaintiff was able to lift and carry was less than 10 pounds. (Tr. 880, 929.) Plaintiff was able to sit or stand for less than two hours each. (Tr. 880-81, 929-30.) Plaintiff could sit for 30 minutes and stand for 5 minutes before needing to change positions. (Tr. 881, 930.) Plaintiff needed to walk around every hour for 5 minutes. (Tr. 881, 930.) Plaintiff also required the capability to shift positions at will. (Tr. 881, 930.) Dr. Nistler stated that these limitations were supported by "[r]ecent extensive neurologic [and] vascular medicine evaluations . . . ." (Tr. 882; *accord* Tr. 930.)

Dr. Nistler opined that Plaintiff could occasionally twist, stoop/bend, and climb stairs, but never crouch or climb ladders. (Tr. 882, 931.) Dr. Nistler opined that Plaintiff's abilities to reach and push/pull were affected by her impairments, but her

abilities to handle, finger, and feel were not. (Tr. 882.) Dr. Nistler explained that these functions were affected by upper extremity numbness, pain and weakness, and constant pain and swelling in Plaintiff's lower extremities. (Tr. 882, 931.) When asked what medical findings supported these opinions, Dr. Nistler listed, in relevant part, Plaintiff's diagnoses of fibromyalgia, lymphedema, cervical disk disease, and asthma. (Tr. 882, 931.)

Dr. Nistler similarly opined that Plaintiff had no restriction when it came to working in wet environments. (Tr. 883, 932.) Plaintiff should, however, avoid even moderate exposure to extreme cold and heat, humidity, and noise. (Tr. 883, 932.) Plaintiff was to avoid any exposure to fumes/odors/dusts/gases/poor ventilation and hazards. (Tr. 883, 932.) Dr. Nistler stated that Plaintiff had "multiple diagnoses . . . that would be complicated/exacerbated by these exposures." (Tr. 883; *accord* Tr. 932.)

When asked if there were any other work-related activities that would be affected by Plaintiff's impairments, Dr. Nistler stated that Plaintiff "[n]eeds to elevate her legs as much as possible" due to lymphedema. (Tr. 883; *accord* Tr. 932.) Dr. Nistler also stated that kneeling/crawling were "prohibited" due to the arthritis in Plaintiff's knees. (Tr. 883; *accord* Tr. 932.) Dr. Nistler estimated that Plaintiff would be absent from work approximately twice per month. (Tr. 883, 932.)

## V. HEARING BEFORE THE ALJ

### A. Plaintiff's Testimony

At the hearing, Plaintiff testified that she lives alone and has an accounting degree. (Tr. 105, 107.) Plaintiff testified that she is able to take care of herself, performing her

own personal care and grocery shopping. (Tr. 112; *see* Tr. 123.) Plaintiff did, however, experience some difficulties. She was no longer able to take baths, had trouble reaching her back when showering, and had "a hard time grooming [her] feet." (Tr. 123.) Somedays, Plaintiff had difficulty getting dressed. (Tr. 123.) Similarly, Plaintiff testified that her conditions affected her hobbies. Plaintiff used to bowl, dance, and participate in theater, but was no longer able to do so. (Tr. 124.) Plaintiff testified that she was continuing her efforts to lose weight and still had her YMCA membership, but had not been able to attend lately. (Tr. 113.) Plaintiff wanted to get involved in swimming again. (Tr. 113.)

As for household chores, Plaintiff testified that she is not able to do much anymore. (Tr. 124.) Plaintiff was no longer able to scrub floors, and could no longer reach all the areas she used to dust. (Tr. 124.) Plaintiff also testified that she had to take breaks, such as while vacuuming. (Tr. 124.) Plaintiff was not able to cook for herself because "standing is difficult," so she ate "a lot of prepared meals" or went out. (Tr. 124.)

Plaintiff testified that she worked part-time for H&R Block between January and March 2016 preparing income tax returns. (Tr. 105-06.) Plaintiff estimated that she worked between 20 and 30 hours per week during this time. (Tr. 106.) Plaintiff testified that her employer "accommodated" her and allowed her to take breaks when needed and pick her own schedule. (Tr. 125.) Plaintiff worked only a couple of days per week, and she was able to work for a few hours, leave to rest, and then come back to work. (Tr. 125.)

When asked about how far she was able to walk, Plaintiff gave an example. (Tr. 107.) Plaintiff testified that she could go halfway down the main hallway of a big retail store before needing a break to sit down. (Tr. 107-08.) Plaintiff testified that, at that point, her legs hurt so much that they felt like "they're going to buckle underneath [her]" and she felt like she was "going to pass out." (Tr. 108; *see* Tr. 118.) Plaintiff testified that things had "gotten a little better" since her knee surgeries, but "[i]t's pretty much like that every day." (Tr. 108-09; *see* Tr. 118.)

Plaintiff testified that, although the knee surgeries reduced some of her knee pain, she still has pain in her knees due to fibromyalgia and lymphedema. (Tr. 118.) Plaintiff's movement and flexibility also remained affected. (Tr. 118.) Plaintiff testified that she could not get down on her hands and knees or squat. (Tr. 118-19.) Plaintiff also had difficulty bending. (Tr. 119.)

Plaintiff further testified that she has constant, severe pain in her lower back due to degenerative disk disease. (Tr. 119.) Plaintiff testified that her back pain affects her ability to do things as her pain increased with activity. (Tr. 119.) Sitting was "a lot easier" for Plaintiff, although "after a while" she needed to get up, stretch, and "move around a little bit." (Tr. 120.) A chair where Plaintiff could sit with her feet on the floor was more comfortable for Plaintiff and a recliner was ideal. (Tr. 125-26.) Relatedly, when asked about her ability to drive, Plaintiff testified that she can drive but needs to take breaks, especially when driving long distances. (Tr. 106.) Plaintiff estimated that she could drive between 30 and 60 minutes before needing a break due to back and leg pain. (Tr. 106.)

Plaintiff also experienced pain and was sensitive to touch due to fibromyalgia. (Tr. 120.) Plaintiff testified that there are some days when her body shuts down completely and she is unable to get out of bed, needing to sleep for an extended period of time. (Tr. 121-22.) Plaintiff testified that she can have "a couple of [these] days during a month." (Tr. 122; *see* Tr. 126.) Stress and weather were also factors affecting Plaintiff's pain. (Tr. 122.)

Plaintiff also testified that she experiences tingling and numbness in both of her arms, with the left being worse than the right. (Tr. 110.) Plaintiff testified that, while the numbness and tingling can vary a little bit throughout the day, they were generally pretty consistent, "especially at night." (Tr. 110.) The numbness and tingling affected Plaintiff's ability to lift and grasp. (Tr. 110.) Plaintiff also testified that she had one instance in which her left hand was numb for approximately an hour in the evening and she was not able to do anything with it. (Tr. 110-11.) Plaintiff testified that she was okay as long as her hands were below her waist, but they would quickly go numb—within approximately 30 minutes—if she had to raise them. (Tr. 126-27.) The more she used her hands, the worse her symptoms were. (Tr. 127.)

Plaintiff also testified about the swelling she experiences in her left hand and both legs. (Tr. 116.) Plaintiff testified that she wears five different types of braces on her legs for compression and one on her hand. (Tr. 117.) Plaintiff explained that, if she doesn't wear her braces, the swelling gets "really bad" and increases her pain, affecting her ability to walk or "do anything." (Tr. 117; *see* Tr. 122.) Plaintiff testified that she was unable to stand even with her leg braces because the pain was too much. (Tr. 117.)

### B. Medical Expert's Testimony

At the hearing, the medical expert identified a number of physical impairments based on the record, including in relevant part, morbid obesity, fibromyalgia, lymphedema, ulnar neuritis, arthritis, and degenerative changes in the spine. (Tr. 128-30.) The medical expert noted that, notwithstanding the fibromyalgia diagnosis there was no "identification of the tender points" or "enumeration of tender points." (Tr. 128-29.)

The medical expert opined that "[t]his record described somebody functioning at the sedentary level, as far as lifting and time on feet." (Tr. 130.) The medical expert opined that a "brief," hourly change of position was warranted, "for a minute or two." (Tr. 130.) The medical expert also opined that there should be no kneeling, crouching, crawling, or working overhead. (Tr. 130.) Plaintiff's obesity would "preclude ladders, ropes, and scaffold[s]," and her "asthma would preclude working in environments with high concentrations of air pollutants." (Tr. 130.) Further, Plaintiff would be limited to only occasional "firm gripping/torqueing" on account of "hand neuritis." (Tr. 130.)

### C. Vocational Expert's Testimony

The ALJ asked the vocational expert about a hypothetical individual with the limitations identified by the medical expert. (Tr. 132.) The vocational expert testified that Plaintiff's previous work as a hospital admitting clerk could be performed according to the *Dictionary of Occupational Titles* ("DOT"), recognizing that the manner in which Plaintiff previously performed it constituted light work versus sedentary work as stated in the DOT. (Tr. 133.)

The vocational expert further testified that while Plaintiff's previous job as a cashier could not be performed per the DOT, which described it as medium work, such a job "could be performed as it occasionally occurs in the economy." (Tr. 133.) The vocational expert estimated that "about ten percent of the jobs could be done at the sedentary level." (Tr. 133.)

The ALJ then asked the vocational expert about transferring skills to other positions and unskilled work. (Tr. 133.) The vocational expert testified that Plaintiff's skills as a hospital admitting clerk could transfer to work as a data entry clerk, also a sedentary position. (Tr. 133.) The vocational expert additionally testified that a hypothetical individual with these limitations could also perform unskilled work as a document preparer, call-out operator, and addresser, all of which were also sedentary. (Tr. 134.)

Next, the ALJ asked the vocational expert if an additional limitation that there should not be "any more than frequent neck rotation, extension, or flexion" would change his testimony. (Tr. 134.) The vocational expert testified that it would not. (Tr. 134.)

Plaintiff's counsel then asked the vocational expert about an additional limitation: use of the upper extremities for fingering for approximately 20 minutes before needing to take a break for 5 to 10 minutes. (Tr. 135.) The vocational expert testified that the jobs identified would no longer be available as they required "frequent fingering." (Tr. 135.) The vocational expert additionally testified that "lower numbers" of cashiering jobs, however, would be available as some of the jobs did not require much fingering. (Tr.

135-36.)  As examples, the vocational expert identified parking cashiers and "[s]ome convenience store[]" cashiers.  (Tr. 136.)

Plaintiff's counsel next inquired about an employer's tolerance for absences.  (Tr. 137.)  The vocational expert testified that approximately 12 absences per year would be tolerated and if a person was absent from work at least twice per month, employment would be precluded.  (Tr. 137.)

# VI. ANALYSIS

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315.  An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. § 404.1512(a).

## A.  ALJ'S Decision

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

In relevant part, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date and had the following severe impairments: "obesity; lymphedema; history of total knee arthroscopies bilaterally; fibromyalgia; asthma; and degenerative dis[k] disease." (Tr. 45.) The ALJ concluded that these impairments individually or in combination did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 47.)

The ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary work with the following additional limitations: "no kneeling, crouching, crawling, overhead tasks, or use of ladders, ropes, or scaffolds; with a sit/stand option on an hourly basis for a moment or two for a change of position from sitting or standing; no more than occasional firm gripping or torqueing; and no high concentrations of air pollutants." (Tr. 48.)

In reaching this conclusion, the ALJ reviewed the medical evidence in the record, specifically considering records addressing, in relevant part, Plaintiff's lymphedema and associated swelling, knee surgeries, and numbness in her upper extremities. The ALJ noted that, while Plaintiff at times experienced increased swelling, the measurements of her lower extremities remained fairly stable with use of the compression program, and

her lymphedema was "a stable condition with little change in the course of treatment." (Tr. 49.) The ALJ also noted that Plaintiff's "knee symptoms were noted to have improved following the total knee arthroplasties" with Plaintiff exhibiting "near full extension and near pain free range of motion." (Tr. 50.) And, although Plaintiff experienced increased tenderness in her knee following a fall, she was still "able to extend fully" and continued to have full strength. (Tr. 50.) In addition, the ALJ discussed Plaintiff's treatment for numbness in her upper extremities. (Tr. 50-51.) The ALJ noted that diagnostic studies were largely normal and there was "no evidence of radiculopathy, plexopathy, neuropathy, or myopathy." (Tr. 51.) For those MRIs showing degenerative changes in Plaintiff's spine, the ALJ noted that these changes were not thought to be the source of Plaintiff's symptoms. (Tr. 50-51.) Plaintiff also had normal muscle tone and strength. (Tr. 50-51.) The ALJ concluded that "[t]he records show little change in the ongoing treatment of [Plaintiff's] conditions, and the objective medical findings . . . , particularly with regard to the neck and arms, do not support limitations beyond those which are set forth [in the residual functional capacity]." (Tr. 51.)

The ALJ also evaluated the opinion evidence, giving reduced weight to the opinions of Dr. Nistler, Plaintiff's treating physician. The ALJ first observed that Dr. Nistler's opinions were "given in the context of [Plaintiff's] applications for county benefits and health insurance[] as well as to help [Plaintiff] address her student loans." (Tr. 52.) The ALJ noted that these opinions were "not supported by the objective findings," citing places in the record where Dr. Nistler's opinion that Plaintiff remained unable to work was inconsistent with contemporaneous medical records. (Tr. 52.)

The ALJ first pointed out that, in "orthopedic records contemporaneous to Dr. Nistler's [September 2014] evaluation," Plaintiff "report[ed] that she still had some slight discomfort but that her knee felt much better, and . . . had near full extension and near pain free range of motion." (Tr. 52.)  In another example, the ALJ noted that Plaintiff reported to Dr. Nistler in February 2015 that "she had pain from her lymphedema so severe that she felt nauseated and could not stand or walk for more than two minutes at a time," yet "the [l]yphedema [c]linic records . . . do not reflect [Plaintiff's] reports of these concerns." (Tr. 52.)

Similarly, when Plaintiff saw Dr. Nistler in August 2015, she stated that "the pain in her forearms limited her ability to work continuously and limited her ability to stand and walk," but at the same time she reported that she had been volunteering for six hours per day, four days per week, for the last two weeks. (Tr. 52.)  During that appointment, Dr. Nistler noted that Plaintiff "did not appear to be in distress, had [a] normal gait and stance, and was sitting comfortably in the exam room." (Tr. 52.)  It was determined that a neurology consultation should take place before Dr. Nistler completed a form regarding Plaintiff's functional abilities. (Tr. 52.)  The ALJ stated that, despite normal test results and unremarkable exams, "Dr. Nistler has continued to complete forms indicating that Plaintiff is unable to engage in any employment." (Tr. 52.)  The ALJ also found that the October 2016 opinion form was completed after Plaintiff's date last insured. (Tr. 52.)  Based on the foregoing, the ALJ gave "some weight" to the limitations Dr. Nistler identified to the extent they were "consistent with the limitations in the residual functional capacity." (Tr. 52.)

Additionally, the ALJ found that Plaintiff was not wholly credible. The ALJ observed that "[t]he course of treatment and the objective examination findings . . . do not support the disabling level of pain and limitations testified to by [Plaintiff]." (Tr. 51.) The ALJ also determined that Plaintiff's daily activities were consistent with a reduced range of sedentary work. The ALJ cited Plaintiff's completion of an accounting degree as a full-time student and trip to Florida "for a competition regarding her program in accounting," where Plaintiff "was noted to have finished very well, in fifth place." (Tr. 51.) The ALJ also pointed out that Plaintiff had "recently been able to do some volunteer work at her college, which involved working for a 6-hour time frame for four days a week for two weeks." (Tr. 52; *see* Tr. 51.) Further, the ALJ noted that Plaintiff "had become more active and had been riding with truck drivers on-over-the-road routes"; "was occasionally going to the YMCA for swimming and walking"; and "live[d] in Red Wing but travel[led] to Rochester for medical appointments." (Tr. 51.)

Based on the testimony of a vocational expert, the ALJ found that Plaintiff was capable of performing her past relevant work as a hospital admitting clerk and concluded that Plaintiff was not disabled. (Tr. 53.)

## B. Issues for Review

Plaintiff's assertions of error primarily relate to the determination of her residual functional capacity. A claimant's "residual functional capacity is the most [she] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based

on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about h[er] capabilities may be used to support the [residual functional capacity]." *Id.* "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c). Plaintiff asserts that the ALJ did not give appropriate weight to Dr. Nistler and the ALJ's residual-functional-capacity determination is not supported by substantial evidence. Plaintiff also asserts that the ALJ erred in determining she was capable of performing past relevant work.

### 1. Fibromyalgia

Plaintiff asserts that "a large part of [her] disability [is] due to her diagnosis with [f]ibromyalgia and associated pain symptoms." (Pl.'s Mem. in Supp. at 19-20, ECF No. 14.) Plaintiff is correct that fibromyalgia is a disorder with symptoms of muscle pain, chronic fatigue and other symptoms that cannot be objectively verified. *See, e.g.*, *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments and other white connective tissues, can be disabling."). "A diagnosis is usually made after eliminating other conditions with similar symptoms, as there are no specific diagnostic tests for this affliction." *Tennant v. Apfel*, 224 F.3d 869, 870 n.2 (8th Cir. 2000) (per curiam); *see*

Social Security Ruling 12-2p, *Titles II and XVI: Evaluation of Fibromyalgia*, 2012 WL 3104869, at *2-3 (Soc. Security Admin. July 25, 2012) [hereinafter SSR 12-2p]. "Fibromyalgia is a chronic condition which is difficult to diagnose and may be disabling." *Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir.2007). At the same time, "not every diagnosis of fibromyalgia warrants a finding that a claimant is disabled." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011).

The ALJ specifically concluded that Plaintiff's fibromyalgia was a severe impairment. The ALJ's residual-functional-capacity determination, however, is "an assessment of what [Plaintiff] can and cannot do, not what [s]he does and does not suffer from." *Mitchell v. Astrue*, 256 F. App'x 770, 772 (6th Cir. 2007); *see Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (defining residual functional capacity as "the most a claimant can still do despite his or her physical or mental limitations" (quotation omitted)). Although fibromyalgia can be disabling, a diagnosis of fibromyalgia alone is not necessarily so. The fact "[t]hat a claimant has medically-documented impairments does not perforce result in a finding of disability." *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004). "It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability." *Id.* (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)). Accordingly, the question before the ALJ was the severity of Plaintiff's symptoms and their effect on her functional abilities. *See Tennant*, 224 F.3d at 870 ("Although fibromyalgia can cause joint pain and fatigue, the issue before the ALJ was the severity of Plaintiff's fibromyalgia-related symptoms."); SSR 12-2p, 2012 WL 3104869, at *2 ("As with any claim for disability benefits, before we find that a person

with [fibromyalgia] is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity.").

## 2. Dr. Nistler

Starting with Plaintiff's argument that the ALJ did not give appropriate weight to Dr. Nistler's opinions, there is no dispute that Dr. Nistler is an acceptable medical source who treated Plaintiff. *See* 20 C.F.R. §§ 404.1502 (identifying claimant's own physician as treating source), .1513(a)(1) (identifying licensed physicians as acceptable medical sources). A treating source's "opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

"Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo*, 377 F.3d at 806; *see Cline*, 771 F.3d at 1103 (permitting the opinions of treating physicians to be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions" (quotation omitted)). When a treating source's opinion is not given controlling weight, the opinion is weighed based on a

number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *Cline*, 771 F.3d at 1103.

The ALJ gave Dr. Nistler's opinions little weight for two primary reasons: first, the opinions were given in the context of assisting Plaintiff to obtain county benefits and relief from her student loans, and second, the opinions not supported by the objective medical evidence. (Tr. 52.) The ALJ also pointed out that the limitations identified by Dr. Nistler were inconsistent with Plaintiff's own reports of her activities. (Tr. 52.)

### a. Purposes for the Opinions

Plaintiff argues that "[t]he fact that Dr. Nistler has offered opinions concerning Plaintiff's functional limitations with respect to application for government benefits, that is benefits other than Social Security Disability Benefits, is not a valid reason to reject her conclusions or opinion." (Pl.'s Mem. in Supp. at 19.) Plaintiff has not cited any authority in support of her argument.

Nevertheless, some courts have held that "[b]aseless speculation about a treating physician's possible motives or biases hardly counts as a 'good reason' for discounting that physician's opinion." *Tracy v. Astrue*, No. C11-3072-MWB, 2012 WL 6743537, at *10 (N.D. Ia. Dec. 28, 2012), *adopting report and recommendation*, 2013 WL 425824 (N.D. Ia. Feb. 6, 2013); *see, e.g.*, *Hurter v. Berryhill*, 712 F. App'x 691, 692 (9th Cir.

2018) ("As we have consistently held, 'the purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them.'" (quoting *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995))).

"The Sixth Circuit has faulted an ALJ for rejecting a treating physician's opinion solely because the ALJ found that the physician's motives were suspect, but the Court has not prohibited an ALJ from examining a treating physician's motives." *Harper v. Comm'r Soc. Security*, Civil Action No. 2:13-cv-123, 2014 WL 3845917, at *17 (S.D. Ohio Aug. 5, 2014), *adopting report and recommendation*, 2014 WL 4626018 (S.D. Ohio Sept. 15, 2014); *cf. Hurd v. Astrue*, 621 F.3d 734, 739 (8th Cir. 2010) (considering cumulatively reasons ALJ gave for giving little weight to treating psychiatrist's opinion, including that opinion was "prepared . . . at the request of Hurd's attorney rather than in the course of treatment"); *Lipari v. Astrue*, No. 10-0779-SSA-CV-W-MJW, 2011 WL 1897449, at *2 (W.D. Mo. May 18, 2011) ("Here, the ALJ properly discussed reasons for giving little weight to the opinion of Dr. Everson, [plaintiff's treating physician,] noting, specifically, that Dr. Everson's opinions were inconsistent with the weight of the evidence, his prescribed treatment and plaintiff's global assessment of functioning scores indicative of mild-to-moderate limitations in functioning. The ALJ further noted that Dr. Everson's opinion appeared to be advocating for plaintiff.").

There are multiple instances in the record where Plaintiff requested, and Dr. Nistler provided, a medical opinion to support Plaintiff's pursuit of some other benefit. There is, however, also an instance in which Dr. Nistler declined to give the requested opinion until additional information could be obtained. In any event, the ALJ did not rely

*solely* on the purposes for which Dr. Nistler's opinions were provided in assigning weight to her opinions. As discussed more fully below, the ALJ also considered Dr. Nistler's opinions in the context of the entire record, including inconsistencies with objective medical evidence, Dr. Nistler's own findings, and Plaintiff's activities. Thus, even assuming for purposes of these motions that the ALJ erred by including the purposes for which Dr. Nistler's opinions were provided as one consideration in determining the weight to be assigned, the ALJ otherwise took into account the appropriate factors and gave good reasons for the weight given to Dr. Nistler.

### b. Consistency with Evidence in the Record

As stated above, the opinions of treating physicians are entitled to less weight when they are not supported by the medical evidence or are otherwise inconsistent with the record as a whole. Plaintiff asserts that there is nothing "in the medical history contradicting Dr. Nistler's opinions regarding Plaintiff's symptoms or limitations." (Pl.'s Mem. in Supp. at 19.) The ALJ pointed to several examples, however, suggesting that the limitations Dr. Nistler identified were based on Plaintiff's subjective complaints and inconsistent with other evidence. *See Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012).

The ALJ did not find Plaintiff fully credible—a finding that has not been challenged here. "[A]n ALJ need not give a treating physician's opinions controlling weight when the opinion is based on a claimant's subjective complaints that [the] ALJ does not find credible." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see Julin*, 826 F.3d at 1089 ("Because the ALJ declined to credit Julin, the ALJ was entitled

to discount Dr. Welsh's opinions insofar as they relied on Julin's subjective complaints."). The ALJ observed that while "Dr. Nistler noted [Plaintiff's] report that she was still recovering from the right knee replacement as it had exacerbated her other conditions and limited her mobility," "orthopedic records contemporaneous to Dr. Nistler's evaluation noted [Plaintiff's] report that she still had some slight discomfort but that her knee felt much better, and [s]he had near full extension and pain free range of motion." (Tr. 52.) *See Casey v. Astrue*, 503 F.3d 687, 693 (8th Cir. 2007) (ALJ properly gave less weight to opinion of treating physician where reports of other physicians were "more favorable" to claimant's health). The ALJ also observed that, despite requesting and subsequently receiving further consultations and examinations whose results were unremarkable, Dr. Nistler "continued to complete forms indicating [Plaintiff] is unable to engage in any employment." (Tr. 52.)

Similarly, it is proper for an ALJ to discount a treating physician's opinion when that opinion is based on a claimant's subjective complaints, rather than the physician's own findings. *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011); *see Renstrom*, 680 F.3d at 1064. The ALJ noted that the limitations identified by Dr. Nistler reflected Plaintiff's subjective complaints rather than Dr. Nistler's own examination findings, such as observing Plaintiff had a normal gait and stance. *See Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009) (ALJ properly discounted opinion of treating physician where severe limitations identified by physician were inconsistent with clinical findings in physician's treatment records).

Plaintiff asserts that "[t]o the extent [the] ALJ decided to effectively ignore the opinions of the treating physician for lack of so[-]called 'objective findings,' the ALJ was acting contrary to Social Security regulations." (Pl.'s Mem. in Supp. at 19.) To some extent, this argument appears to be directed towards Plaintiff's fibromyalgia diagnosis and the nature of this disease. *See supra* Section VI.B.1. Yet, the Eighth Circuit Court of Appeals has repeatedly upheld the discounting of a treating physician's opinion based on the lack of objective findings, such as normal muscle strength and range of motion, notwithstanding the claimant's fibromyalgia diagnosis. *See, e.g.*, *Heino*, 578 F.3d at 880; *Flynn v. Astrue*, 513 F.3d 788, 793 (8th Cir. 2008); *Casey*, 503 F.3d at 692, 693-694. And, that is the situation in this case, as the medical record has a number of examples of Plaintiff having normal muscle strength and range of motion.

Further, the regulations require the ALJ to consider the consistency of treating physicians' opinions with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014) ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). As discussed above, the ALJ considered Dr. Nistler's opinions in the context of other objective medical evidence in the record, including numerous examinations by other treatment providers, imaging studies, and Dr. Nistler's own clinical findings. The ALJ recognized Plaintiff's "longstanding history of bilateral lower extremity edema and left upper extremity swelling which has been treated with compression wraps," pointing out that, while Plaintiff had periods of increased swelling, her lymphedema remained fairly stable and no changes were made to her compression program.

Additionally, notwithstanding a setback following a fall, Plaintiff's knee symptoms improved following her surgeries, and Plaintiff had normal range of motion and full strength. Acknowledging Plaintiff's complaints of numbness in her upper extremities, the ALJ cited evidence showing that Plaintiff continued to exhibit normal muscle tone and strength in her upper extremities and imaging studies were largely normal. The ALJ additionally recognized that, while "a follow-up MRI of the cervical spine did suggest progressive disc bulging at C4-5, resulting in moderate spinal stenosis and severe C5 neural foraminal narrowing," there were no "associated spinal cord signal changes, and Neurology did not feel this was the likely cause of [Plaintiff's] symptoms." (Tr. 51.) And, again, the ALJ cited to inconsistencies between the degree of limitation opined by Dr. Nistler and the clinical findings reflected in her treatment notes. The ALJ properly considered other objective medical evidence in the record when determining the weight to be given to Dr. Nistler's opinions.

Moreover, the ALJ also properly considered Dr. Nistler's opinion in light of other evidence in the record, such as Plaintiff's activities. The ALJ noted that, during the same visit in which Plaintiff told Dr. Nistler that "the pain in her forearms limited her ability to work continuously and limited her ability to walk," she also reported that "she had recently begun to do some volunteer work at her college, which involved working for a 6-hour time frame four days a week for two weeks." (Tr. 52.) The ALJ properly discounted Dr. Nistler's opinions "when they were contradicted by or inconsistent with other evidence in the record." *Howe v. Astrue*, 499 F.3d 835, 841 (8th Cir. 2007); *accord*

*Julin*, 526 F.3d at 108 (opinions of treating physicians "may be given limited weight if they are . . . inconsistent with the record").

Plaintiff also asserts that "[t]he ALJ made no finding that Dr. Nistler had treated Plaintiff over a sufficient period of time in order to make a valid assessment as to her functional limitations." (Pl.'s Mem. in Supp. at 19). The nature of the treatment relationship is one factor to consider when assigning weight to opinion evidence. 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). But, although the ALJ did not explicitly discuss the length of the treatment relationship, the ALJ specifically described Dr. Nistler as Plaintiff's primary care physician and discussed several of the appointments Plaintiff had with Dr. Nistler over the course of approximately three years. As such, while the ALJ did not include an explicit finding on the length of Dr. Nistler's treatment relationship with Plaintiff, the ALJ's discussion of that relationship demonstrates an appreciation for its longitudinal nature. In any event, this factor is only one of several to be considered.

Based on the foregoing, the ALJ gave good reasons for assigning little weight to the opinions of Dr. Nistler, and substantial evidence in the record supports the ALJ's treatment of her opinions.

### 3. Residual Functional Capacity

The ALJ determined that Plaintiff was capable of performing a modified range of sedentary work. Plaintiff argues that this residual-functional-capacity determination is contrary to the opinion of Dr. Nistler and Plaintiff's own testimony.

While Plaintiff suggests that the ALJ "totally discount[ed] the opinions and conclusions of Dr. Nistler," (Pl.'s Mem.in Supp. at 20), several of the additional limitations included by the ALJ in Plaintiff's residual functional capacity were the same as the limitations identified by Dr. Nistler, such as no kneeling, crouching, crawling, or using ladders. Dr. Nistler opined that Plaintiff needed a sit/stand option, and the ALJ included one. Others, too, were largely consistent. Dr. Nistler opined that Plaintiff's impairments would impact her ability to reach, including overhead, and the ALJ limited Plaintiff to no overhead tasks. Dr. Nistler opined that Plaintiff should lift less than 10 pounds. The ALJ limited Plaintiff to sedentary work, which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Dr. Nistler additionally opined that Plaintiff should avoid all exposure to fumes, odors, dusts, gases, poor ventilation, etc., and the ALJ limited Plaintiff to jobs with "no high concentrations of air pollutants." (Tr. 48.)

Plaintiff takes issue with those portions of the residual-functional-capacity determination regarding how often she needs to change positions and use of her hands. Relying on Dr. Nistler, Plaintiff also asserts that she needs to elevate her legs as much as possible and will be absent from work at least two times per month. The Commissioner responds that Plaintiff has not met her burden to show that she has grasping and fingering limitations and the ALJ's residual-functional-capacity determination is supported by the medical expert's testimony as well as Plaintiff's own activities. Plaintiff bears the burden to establish her residual functional capacity. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th

Cir. 2016); *see* 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled.").

With respect to use of her upper extremities, the ALJ limited Plaintiff to "no more than occasional firm gripping or torqueing." (Tr. 48.) Citing evidence in the record that she experiences swelling, numbness, and tingling in her upper extremities, Plaintiff contends that the medical evidence "is inconsistent with [her] being able to perform a sedentary job that involved consistent use of both hands for either grasping, or fingering." (Pl.'s Mem. in Supp. at 21.) As the Commissioner points out, however, Dr. Nistler did not identify any handling, fingering, or feeling limitations, and the objective medical evidence showed that Plaintiff had full strength in her upper extremities as well as no evidence of radiculopathy, plexopathy, neuropathy, or myopathy. Moreover, the medical expert testified at the hearing that Plaintiff would be limited to only occasional firm gripping/torqueing on account of her hand neuritis. The ALJ's residual-functional-capacity determination was also supported by evidence in the record regarding Plaintiff's activities, including attending school full time for an accounting degree and doing volunteer work for her college. *See Tennant*, 224 F.3d at 871 ("It was proper for the District Court to consider Plaintiff's part-time college attendance, as carrying 17 credit hours of chiropractic classes while maintaining a C average appears inconsistent with allegedly disabling joint pain and fatigue.").

As for changing positions, Dr. Nistler opined that Plaintiff was able to sit or stand for less than two hours each; could sit for 30 minutes and stand for 5 minutes before needing to change positions; and needed to walk around every hour for 5 minutes. Dr.

Nistler also opined that Plaintiff needed to elevate her legs as much as possible due to her lymphedema. The medical expert testified that Plaintiff was limited to sedentary work with a brief change in position every hour. The ALJ included a limitation that Plaintiff be able to change positions from sitting or standing every hour "for a moment or two." (Tr. 48.) The ALJ did not include any elevation requirement.

Substantial evidence in the record supports the change-in-position limitation and exclusion of any elevation requirement. The ALJ's determination was consistent with the testimony of the medical expert. The ALJ also pointed to medical evidence in the record that Plaintiff's lymphedema was largely stable with the use of compression wraps, improvement in Plaintiff's knees following surgery, and findings of full strength and near full range of motion in her lower extremities. Further, the ALJ noted that Plaintiff had travelled to Florida for an accounting competition, "had been riding with truck drivers on over-the-road routes," and travelled from Red Wing to Rochester, Minnesota, for medical appointments, a distance of approximately 45 miles.[5]

Plaintiff contends that, "[d]ue to the severe limitations that [she] will experience while attempting to do ongoing work[,] she will not be able to meet the attendance requirements usually associated with competitive labor." (Pl.'s Mem. in Supp. at 21.) Again, the ALJ did not find the degree of pain and limitation alleged by Plaintiff to be fully credible based on the objective medical evidence and Plaintiff's daily activities. Dr. Nistler's opinion was the only medical evidence supporting a degree of absenteeism and,

---

[5] The Court takes judicial notice that the distance between Red Wing and Rochester, Minnesota, is approximately 45 miles. *See Mut. Ben. Life Ins. Co. v. Robison*, 58 F. 723, 732 (8th Cir. 1893) (taking judicial notice of distance).

for the reasons stated above, the ALJ properly gave little weight to Dr. Nistler's opinion. Therefore, substantial evidence in the record supports the ALJ's determination that Plaintiff would not be absent from work twice per month.

Here, the ALJ considered all of the relevant evidence, including the medical records, opinion evidence, and Plaintiff's activities, in assessing her functional limitations. *See Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013); *Perks*, 687 F.3d at 1092. It is not the role of this Court to reweigh the evidence. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Even if it were possible to draw two inconsistent positions from the evidence after reviewing the record, this Court must affirm if one of the positions represents the findings of the ALJ. *Perks*, 687 F.3d at 1091; *Cox*, 495 F.3d at 617. The Court concludes that the ALJ's residual-functional-capacity determination is supported by substantial evidence as a whole.

### 4. Past Relevant Work

Lastly, Plaintiff contends that the ALJ "erred in determining that Plaintiff, despite her multiple severe impairments, continues to be able to perform her past work as a cashier." (Pl.'s Mem. in Supp. at 21.) But, the ALJ did not conclude that Plaintiff was capable of performing work as a cashier. The ALJ concluded that Plaintiff was capable of performing her past relevant work as a hospital admitting clerk. While the vocational expert provided testimony about the availability of some cashiering positions fitting the hypotheticals proffered by the ALJ, the ALJ did not base the decision that Plaintiff was not disabled on this testimony.

"In order to constitute substantial evidence, a vocational expert's testimony must be based on a hypothetical that captures the concrete consequences of the claimant's deficiencies." *Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (quotation omitted). Here, in response to a hypothetical including all of the limitations contained in the residual functional capacity, the vocational expert testified that such an individual was capable of performing Plaintiff's past relevant work as a hospital admitting clerk as it is generally performed. Plaintiff contends that Dr. Nistler's opinions "describe restrictions that will prevent [her] from performing even a sedentary job such as [a h]ospital [a]dmitting [c]lerk," focusing on the lifting/carrying, position, and attendance restrictions identified by Dr. Nistler. (Pl.'s Reply at 2, ECF No. 17). As stated above, Dr. Nistler opined that Plaintiff should lift less than 10 pounds and sedentary work involves lifting no more than 10 pounds at a time. And, again as stated above, the reduced weight assigned to Dr. Nistler's opinions to the extent they were inconsistent with the residual-functional-capacity determination and the residual-functional-capacity determination itself are supported by substantial evidence in the record as whole. An ALJ is not required to include limitations in the hypothetical that are not supported by the record. *Perkins*, 648 F.3d at 902; *see Renstrom*, 680 F.3d at 1067.

Because the ALJ's residual functional capacity determination is supported by substantial evidence on the record as a whole and the hypothetical question posed to the vocational expert captured the concrete consequences of Plaintiff's impairments and limitations, the vocational expert's testimony that such a person was capable of performing Plaintiff's past relevant work as a hospital admitting clerk constitutes

substantial evidence supporting the denial of benefits.  *See Scott*, 855 F.3d at 857; *see also Renstrom*, 680 F.3d at 1067-68.

## VII. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgement (ECF No. 12) is **DENIED**.

2.  Defendant's Motion for Summary Judgment (ECF No. 15) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September___25___, 2018

_____*s/ Tony N. Leung*_____
Tony N. Leung
United States Magistrate Judge
for the District of Minnesota


*Leslie J. v. Berryhill*
Case No. 17-cv-1319 (TNL)